I would like to reserve three minutes of my time for rebuttal, if I may. Your Honors, in this case, Mr. Belea and Ms. Varvas did not leave their country and did not escape because they have suffered persecution. Excuse me, Counsel. Yes, Your Honor. As I understand it, there's a BIA decision that says the risks to the life and health of a criminal informant in a foreign country do not classify such persons as being in a social group for purposes of the five categories for asylum and withholding of deportation. My understanding is that a Ninth Circuit case says we have to defer to that BIA view. I have two questions. Am I right on both of those things? And if I am, why doesn't that end the claim for withholding, even if you can get past the time bar? Your Honor, for the first question, yes, you are correct. And I believe the Court is referring to a matter of CA. I can't remember the name. The 2006 case. That's the BIA case. Correct. And, Your Honor, if I may respond to that question, first thing I would point is that in CA, the board specifically actually distinguished a subset of criminal defendants and stated that when the identity of those criminal defendants are made known to the cartel, then they may satisfy a social group. Our position is that in this particular case, the board actually cited to matter of CA. We actually made that point to them, and yet they did not respond. The second aspect, Your Honor, is that I would respectfully refer the Court to the fact that in matter of Hernandez-Rivas v. Holder, this Court has taken an argument in bank to determine whether Chevron deference should be afforded to the BIA with respect to what they call the refinement of the matter of Acosta standard for purposes of particular social group and to determine whether the visibility and particularity that was the centerpiece of matter of CA actually should be given that deference. And, in fact, the Ninth Circuit in that particular bank, I apologize, I believe that no decision has been rendered. No, that's right. Let me get back to CA for a moment, will you? As I understood CA, it said courts have recognized that informants in some situations may be able to demonstrate persecution on account of political opinion, such as a whistleblower who reported corrupt behavior of government officials. But no court has held that government informants against a criminal enterprise, such as a drug cartel, may constitute a particular social group. And then they go on to this particular case, and they say given the voluntary nature of the decision to serve as a government informant, lack of visibility, and indications that the cartel retaliates, we find that respondent has not demonstrated that non-criminal drug informants working against the Cali drug cartel constitute a particular social group. So I don't understand the distinction you're trying to draw or the exception you're finding in CA. Well, Your Honor, I'm referring to the particular statement in CA that says recognizability and visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of the cartel. So you're saying if somebody is an informant but the bad guys never find out about them, then he does qualify for asylum? Well, I believe the board said if the person informs and the cartel members do not find out about it, then they don't have the visibility and particularity. Ergo, they do not meet within that new particular standard we're setting up because it is a personal decision, it's not clearly visible, and ergo, we are not going to afford you the stance. And in a particular case in CA, the identity of that criminal informant was never made known to the cartel. And so there was a distinction that was drawn. Now, I will again, with the permission of the Court, point out since the Third Circuit decision and the Seventh Circuit decision that have questioned the reasonableness of the decision in CA and the new additional standards that have been elicited or stated by the board, the government has offered a new position currently before the board and is asking that the physical visibility aspect that seems to be a portion of the analysis of CA be abandoned and they're now arguing for something they call a social distinction. Whether the board will accept that or not is to be seen. But I believe the question is that the CA and matter of SCG that dealt with Amaras and most of the claims that have been dealt by the Circuit Court. Are we talking here about a visibility of a social group? For example, Episcopalians may look the same as everybody else, but if a government wants to discriminate against Episcopalians, it can keep its eye open for who goes to the Episcopalian church on Sunday? Well, that is pretty much the case. Under the CA, if those people will not look any different, then they may not be visible. And then the question is, well... What I'm talking about is a distinction between visibility of the group and visibility of the individual. Well, I believe that the question under the Refugee Act is the visibility of the group. And then you do have the extra... That's what I thought. So why are informants visible as a group? Well, informants... I mean, I think in this particular case, we have witnesses or undercover sources that have been used repeatedly by U.S. law enforcement. And those individuals actually have been... And the claim is their identity, their activities, have been made known to the convicted traffickers. So they comprise... Let's just stop there a second. Let's assume you're correct about the unbanked. There is an unbanked case, which is considering what the meaning is of visibility. So let's assume you're correct about all of that. In this case, you talk about traffickers. I don't see any evidence in here that there's trafficking in human beings. Trafficking ordinarily means you get the... Like sex trafficking. Or some reason that the criminal group is sending the individual to another country for the benefit of the group. Here is one individual who wants to get a visa. I don't see any allegations that there's some kind of group trafficking going on in this case. There may be people selling visas. But when your client got to the United States, he had nothing to do with the group. He had nothing to do with the people who helped get him a visa. Why is that trafficking? Well, Your Honor, I think we are not claiming that Mr. Belay and Ms. Varva satisfy the requirement of the U.S. statute that defines human trafficking. I believe what we have... Or any definition of human trafficking that I'm aware of. Well, I believe what we've argued is that based on the facts and the background information, there is a smuggling and trafficking that is very prevalent in Romania. Are you saying that anybody who buys visas from crooks who issue phony visas is a victim of human trafficking as opposed to a perpetrator of his own alien smuggling? Well, yeah. I know that it's kind of a semantic distinction. Clearly, the people who buy the visas have violated U.S. laws. In this case, Ms. Varva testified that when they were first approached by Darbalao's father, they have no reason to believe that there was something, because previously she had used another agency to get a legitimate C1, D1 visa to work for a Norwegian cruise line. And she testified, when I came here, I was supposed to do one job. They told me, no, you're going to do another job. And there was absolutely nothing real. I thought what they did was they paid a lot of money to some outfit that gave them phony visas to come to the U.S. as circus performers. They never performed in a circus. They got their visas. They came to the U.S. and they disappeared into this big country. Well, you know, they never performed any circus. They were never circus performers. They never worked for Magic Star. In fact, Magic Star never appears to have done. They just paid Magic Star a lot of money to get circus performer visas. Well, actually, they, if the court will take a look at the record, is they first thought that they were just going to pay a reasonable amount, and their IDs were taken by the father who held those IDs, and said, well, you're going to have to do this, this, this, this. You're going to pay me this $4,000 per person because that's what we're going to do. Once they came here, it was. . . I don't see where that changes anything. It's like a surgeon who opens you up and says, that was your $10,000, and now I'll charge you another $10,000 to sew you back up. Well, they were put into that web that the Durbalaus had in Romania with the help with a variety of institutions, and they came here. Clearly, they benefited of the fact that they entered the United States with a visa. But after their visa was approaching, they were contacted by the same individual who says, well, look, if you want to stay here, you're going to have to pay more, or if not, this is going to happen to you. So this was not a situation when somebody pays a smuggler, come to the border, and nobody, never hear back from them. This was an organized web, and actually the criminal. . . Ms. Vesic, I might just ask you a quick question because I know you're running out of time. Taking for a moment as true some of these statements you've just made as far as your clients are concerned, where's the government involvement in this? These are all just individuals, aren't they? It's a criminal organization, admittedly, but they're just individuals. Your Honor, is the court talking about the government of Romania? Correct. I'm sorry. Well, Your Honor, I believe what we have argued from the beginning is that the persecution, the well-founded future persecution is based on the fact that the government of Romania is unable to control those criminal groups, and they do work in connection with the local police. I understand your concept, but you're talking about something so attenuated. Admittedly, there is case law that if you have an individual, say a crime group, and a lot of people have been persecuted and the government has been asked to help and they haven't done it, that's one thing. There's nothing like that here. You're just saying in general that there are these criminal groups out there and the government hasn't done anything. Is there a specific allegation that you have put forward in evidence to the effect that your clients, or for that matter anybody else, has asked for the help of the government of Romania in connection with this particular criminal group? Well, Your Honor, we do not have any evidence in the record that somebody has asked for protection against this particular group. Isn't that the end of your story then? How can you possibly get a protected status protection if the government's not involved? Well, Your Honor, what we have provided to the court as argument is that Ms. Varva testified of what she has been told, what Dr. Bolayu told them about their connection. Oh, it's a double hearsay at best, based upon the alleged failure to act of the government. I mean, how does that get you anywhere? Well, if I may continue, she was found credible. Also, we have provided evidence in the city of Brastov, which describes in that page 380 of the administrative record and thereafter, which describes an actual clash between similar rival grants and what the police did not do. They did not interfere at all because they are complicit. And is your perspective that that is enough evidence to get your clients where they need to get, even assuming that what they are claiming constitutes a protected class? Well, Your Honor, we believe that is something that we should have been able to get a reasoned decision. The IJ did not consider, and the BIA for the first time talked about systematic persecution. You still have to give evidence, and what I'm asking is, is what you just described the very best evidence that you have to sustain your position, assuming that the IJ had considered it. Is that your best evidence? Yes, Your Honor, it is the testimony and the records that we have. Okay. All right. Well, you've got one minute left. We'll give you two minutes for rebuttal. Thank you very much, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Andrew Nsinga for the respondent, the Attorney General. Eight hundred and seventy-two individuals entered the United States through the visa fraud scheme, also used by petitioners in this case, and their asylum applications they claimed they will be singled out for persecution because they cooperated with the United States government in prosecuting the people involved in that scheme. The agency determined that petitioners failed to file their asylum application within a reasonable period of the changed circumstances. Nonetheless, the agency also determined on the merits that petitioners failed to demonstrate eligibility for asylum, withholding and removal, and cap protection, and the record evidence amply supports those determinations. Turning first to asylum, Your Honors, the agency determined that petitioners failed to file within one year of their arrival and failed to demonstrate changed circumstances. Under asylum statute, the Court lacks jurisdiction to review that determination. Well, they were told that nothing would be done to them as long as they were cooperating with the government in whatever these criminal schemes were. Then there was a credit card scheme also that they were cooperating with the government on. Well, Your Honor, I would request the Court take some caution with regards to petitioners' factual assertions in this case. For example, there was some involvement with a credit card investigation. Petitioners argue in the brief that they went to two restaurants after Mr. Dribbleau was convicted in February, well, he was actually convicted in late 2006, sentenced in 2007. Petitioners' factual allegations are incorrect. They cooperated with this credit card scheme primarily in October of 2006, before the government issued a notice to appear. Well, what does primarily mean? Does that mean they were still cooperating after that? The only evidence, the only actual evidence in this case, Your Honor, about cooperation after the government issued the NTA and after a hearing before an immigration judge had been scheduled was that in May of 2008, the FBI, along with Kim Morneau, who was an agent with ICE, DHS, approached petitioners and asked if they'd be willing to help again about another credit card scheme. That is essentially the end of the evidence on that. There's no indication they ever did anything. At most, all Ms. Varvas testified to was, yeah, as long as you keep me safe. Well, there's no indication there was any discussion about any continued deferred action, as petitioners have called it. So let me be sure I understand the government's position. Dribbleau was, the judgment was entered in February 2007, and Ivanov in April of 2007. So the government's position is that at the very, well, the NTA was served immediately thereafter. So the timing runs from those two periods. Is that correct as to those individuals? Correct, Your Honor. April 2007. Okay. And so under that basis, they have to come up with some good reason why there was no filing within the one-year period, right? Correct, Your Honor. And taking the credit card scheme, you're saying that with respect to the first one, not the new one that you just brought up about the FBI in May of 2008, that that began in April of 2006. Was it completed by the time that the judgment was entered against the Dribbleau that was involved in that one? Are you referring to the first credit card scheme? April 2006, the credit card scheme. The only evidence in this case about that is essentially that in October 2006, the FBI asked them to go to a restaurant twice and sort of listen in for any – I thought you said April. Did you say October? October of 2006. Sorry, that's on page 198. Okay, they asked them to go to a restaurant. By the time in the case of Dribbleau, by February of 2007, had that completely run its course? Does the record show one way or another? There's no evidence. Again, testimony is fairly vague in this case, Your Honor. There's nothing other than that specific date of October 2006 to judge when anything else occurred. And the same thing with Ivanoff as far as April 2007? Well, petitioners never claimed they would be persecuted by Ivanoff, who is, to be clear, a Bulgarian national. I understand. So we're just talking about the one then. Correct, Your Honor. In that case then, is the government's position that, yeah, there are these allegations about the credit card scheme, but there are no allegations made by Dribbleau that he would be protected as a result of that credit card participation. Is that correct? Correct, Your Honor. They said that they would sort of Ms. Varvis testified that she wanted her to be safe because she feared that the credit card schemers were, of course, criminals. Right. That's pretty much the extent. Petitioners' argument tries to draw out a lot more of such minimal testimony, but there's nothing other than that. And under the evidentiary rules, there's an obligation on the part of the petitioners to provide substantial evidence to corroborate any material point that they have to prove. Is that correct? Yes, Your Honor. Again, petitioners are represented by counsel. They had a full and fair opportunity to present evidence on this matter, and they simply failed to. Well, there was a finding. It's not that she was credible. They determined she was credible. And there's no denial by the government of her testimony, whatever it stands for. Certainly. Either it stands for the fact that she was going to be protected against these people, or it stands for the fact that she was going to be not shipped back, one or the other. I don't know which. Which do you think it stands for? Well, Your Honor, with regards to the... She was told she was protected against something or given some benefit for some period. She was. The board determined that the government had sort of agreed to defer removing her and her husband, Ms. Vargas and her husband. But that ended in January, February 2007. How do we know that? Was there an adverse credibility determination? No, Your Honor. Well, then we just take what she said as being true. Now, if we do that, what we've got is the government asks these people to help investigate a criminal. They do. And then on the government's theory, they were never called to testify because the Durbelow son that they were trying to nail pleaded guilty. But you never know if somebody's going to plead guilty until he pleads guilty. So up until the time there was a final judgment, there was always the possibility that the government would need testimony from them. Certainly, and the board recognized that, Your Honor. Mr. Durbelow pled guilty in late 2006. He was sentenced definitively in February 2007. Petitioner Ms. Vargas testified that in January or February 2007, the Department of Homeland Security told her. But then they asked her to be a snitch again, didn't they? The FBI approached her. The FBI said, we have another credit card crime we want you to check out for us. And there's no indication that at that point the FBI or Department of Homeland Security agreed to defer action again. At that point, in May of 2008, Petitioner had been in. Here's what I'm wondering. I'm wondering if their year for timely filing should run from the day they get their notice to appear. Because until then, they're still in this murky world of being protected snitches. To be clear, Your Honor, the changed circumstances is not a tolling statute. It's simply that they must file for asylum within a reasonable period of changed circumstances. The regulation provides generally six months might be in the court in Huseyov. The notice to appear is a change of circumstance. The government is no longer letting them stay here. Certainly, Your Honor. And the board recognized that that was a change of circumstance. How long after that did they file? Sixteen months. And in Huseyov, this court held that 364 days is presumptively not reasonable. Okay, so they didn't file until 16 months after the notice to appear. Correct, Your Honor. Now, during that 16 months after the notice to appear and before they filed, were they asked to be snitches again? In May of 2008, the FBI approached them, asked them to become involved in some sort of credit card scheme. Ms. Varves said, as long as you keep me safe. And that is really what she said, as long as you keep me safe. Well, one of the things keep me safe could mean is keep me in the United States and not send me back to Romania where these people are in charge of what goes on because the government can't protect me. There's no evidence of that, Your Honor. Petitioner had counsel. She had an opportunity to present such. I mean, it certainly is an ambiguous statement, as long as you keep me safe. You might think that she means here, not that keeping me safe means I'll send you back to Romania. Who wants to go back to Romania? Chief Judge. Right. Not for long, though. As you said, Your Honor, it's ambiguous. But Petitioner had the burden of proof on this matter, and unfortunately represented by counsel with an opportunity to present evidence on this. Well, I would think, I must say, for what it's worth, if somebody said, okay, I'll cooperate with you as long as you keep me safe, it doesn't mean that you're going to send me back to Romania where I don't think I will be safe. Well, Your Honor, the government's position is that that's simply an ambiguous statement, that there's nothing at that point to create a reasonable delay on their part. Do you need the untimeliness? No, Your Honor, which is a good point, because at this stage, the agency also may assume that they timely filed. Even if the court assumes that they timely filed, the agency determined Petitioner's failed to demonstrate eligibility for a variety of reasons for asylum withholding. What's your best reason? Keeping in mind that we're in bank, you're familiar with that? Yes, Your Honor, I am. Essentially, the particular social group in this case is precluded by Soriano and Velasco Cervantes. Those are the two opinions by this court essentially upholding the board's decision in CA. In that case, they determined that a government informant is simply not a homogenous group. Any person of any background, of any political leaning, of any demographic. Well, certainly the question is presented in the in-bank case of whether you have to be an actual witness or whether you are an informant. Well, Your Honor. That goes to the visibility issue. It goes to the visibility issue, Your Honor, and I think I don't want to confuse it too much, but visibility is merely one aspect that the board has determined. And particularity, whatever that means. Yes, Your Honor. Of course, these are very vague terms, which is, of course, why the court defers to the agency whose job it is to attempt to interpret such complicated statutes. But at the end of the day, under sort of the court's formulation of the particular social group test, there is no innate characteristic or sort of conscience that is being protected here. Petitioners cooperated. At the end of the day, they agreed. Well, ordinarily witnesses cooperate, and if you're a witness against a group that the government is prosecuting, you may well be a member of a social group. It's possible, Your Honor, and the law doesn't preclude that possibility. I think the more difficult question for petitioner here is whether there's any evidence that the government is in any way not going to allow persecution of somebody who's just in an ordinary criminal operation and testifies against it. Your Honor, of course, that is one of the issues in this case for both protection and the asylum and withholding. The fact is, petitioners, again, argue fairly broadly based on fairly poor facts. Petitioners did not walk into a web of any nature, or they were not trapped in a web in which the government is involved whatsoever. They testified they voluntarily went to Costal Dubalau, the man in Romania. They voluntarily paid him $8,000. They voluntarily traveled to the United States. They voluntarily renewed those applications in the United States for another $4,000. Well, I'm not sure that matters particularly. If it's a criminal operation and they testify against it, they could have a problem if the government doesn't protect them in Romania. Potentially. I mean, they could. Let's say they would. Whatever it is, whether you joined the mafia or somehow you were forced into it for some reason, once you turn on them and the government's unable to protect you, if you're deported, then you might be subject to persecution. But you need evidence that the government's unable to protect you or unwilling to protect you. Is there any such evidence here? No, Your Honor. As Your Honor already has recognized, there's no specific allegation of any particular threat here. There is corruption in Romania, as there is corruption in many countries, unfortunately. Well, Romania particularly. Yes, but certainly the record shows, the documents presented by petitioners demonstrate, that since 2007, particularly when Romania joined the European Union, the Romanian government, with the assistance of the United States and other governments, have taken a variety of steps to correct that. And there's simply no evidence whatsoever that the Romanian government would be involved in this. Thank you, Counsel. Thank you, Your Honor. Your Honor, I just want to point to the record just to respond to counsel. Yes, please. And the one thing that Ms. Farvas said, it's Administrative Clause 197. I said, I don't want to go because I'm afraid. Not unless you go there with me and you offer me protection, because I'm afraid of these kind of people. They're dangerous. And I said, as long as we have protection, we'll be fine. But just make sure we don't get hurt and our folks home don't get hurt. Then, Your Honor, at page of the record, which is 194, we have an exchange between the trial attorney and Ms. Farvas. And she said, at some point, Ms. Kim Moreau was asked to step out of the room by the local FBI and police people. And they said, listen, if you help us with the FBI, then we can keep you here. And I said, but, yeah, are you offering me protection? And, oh, yeah, you're perfectly safe. You know, we're not going to be put in a situation when somebody could harm you. Your Honor, that is not just a flimsy evidence. They were told. Let's say you've got all that. I can see the point of that. The case strikes me as a case like somebody who buys a phony driver's license and gets caught in a sometimes fairly trivial way, like an underage kid who buys a phony driver's license to be able to get a beer at a bar, and sometimes something more serious. They get caught, and then they say, and the police say, we won't charge you as long as you tell us who you bought it from. And the person with the phony driver's license says, but I need protection. The kind of people that sell these phony licenses may hurt me. And the police either say, yes, we'll protect you, or we don't think there's a threat, or you're on your own, or whatever. Your Honor, I don't see where there's any evidence here that the Romanian government is in cahoots with the people that sell phony visas to get into America and is going to persecute anyone who snitches them out. Your Honor, I believe Ms. Varva testified that one of the officers told her, look, we'll protect you if you're here. We can't do anything with a sovereign country. It was the government who told them, look, you're fine here. You have two different points. And one is, for the ordinary immigration purpose or deportation purpose, you need to show that there is not just a subjective but an objective fear that the Romanian government will be unable to protect you. That's one issue. Your second issue, which I don't think you've made an issue in this case, but I just want to make sure, is if the FBI promises you they'll keep you here and then sends you back, is the fact that you have a promise from the government, does that mean that they can't break the promise? That's a totally separate case. You're not arguing that point, are you? No, Your Honor. I don't believe that there is a basis to say, well, the government has to keep their promises. I think the new deferred... That would put us in great difficulty, wouldn't it? The new deferred action or the prosecutorial discretion actually explain what actually happens with deferred action. What happened is the FBI was asking these people for help. Government says, we will keep them here for you. And then Ms. Moreau goes in and files the NTA. She has perfect right to do so. But what counsel says, 16 months later they filed. That's not correct. We're laying aside the timeliness problem. I'm looking at the merits. Yes, Your Honor. And as far as the timeliness, if they said that they would protect you here or keep you here for a while, we're setting that aside. The question is when they then decide to deport you, you're not saying that the fact that they're breaking a promise, that they are breaking a promise, or that that matters. What you're saying is, as in the ordinary case, that there is a danger in Romania that the government won't protect you. That is correct, Your Honor. All right. Thank you. If I may, just one quick question here. I want to go back to the time issue because I want to understand the interplay between you and the government here. The government contends that any promise was fulfilled prior to these two individuals' judgment being entered against them. And I think in your client's case it was February of 2007. You're now speaking of certain promises. Are those promises related to the credit card scheme that occurred after that or they refer to some other promise? Well, Ms. Varvas testified and Ms. McIlvenny confirmed that she was told, look, as long as you cooperate with the Magic Start on one hand and the FBI credit card rings on the other, you'll be safe in here. That's what the record says, tying those two together? Correct, Your Honor, it does. Where's the reference on the record? Your Honor, that is at page 75. That's not correct. That's of the administration. It's page 29. It says, Ms. Kimura mentioned that as long as we've been involved with the That is the testimony. That was the cross-examination. And that testimony is what we are to rely upon in terms of whether there's substantial evidence to that effect. Is that correct? Well, in this case, yes, Your Honor, because the government never produced any of their investigatory intent. Ms. Varvas did not know when the cases will go through what step. What we know is that Kimura told them, look, the Magic Start is coming to an end. You may be put in proceedings. Krzysztof Ivanov gets sentenced on April 12th. The next day, she was served with an NTA. She knew certainly by that date that any deal that she had was over. On that date, I believe what the position the BIA took is yes. What was her position? Did she do anything, say anything? Is there anything in the record that shows that she reacted in any way to the receipt of the NTA? No, Your Honor. What she says is they continue to come in and asking her for so many minutes, so many dates. The last one was May 2008. That was the week before the hearing. Now, what I think is relevant in this case is that they were served with the NTA. Notice the actual asylum application says once you're served with the NTA, the IJ acquired complete jurisdiction. Page 10 of those instructions says when you go to court, the trial attorney will give you instructions how you file your application. With the immigration court. Is that in the record? Yes, it is. It's in the record. Where is that in the record? Your Honor, the application, actually the record, the instructions are available, and I cited to the webpage. The instructions were not included in the actual record. This is instruction to the form I-589, which is the asylum application. The board manual say any defensive application has to be filed with the immigration court directly. The immigration court in Seattle received the NTA in April 2007, did not schedule the first master hearings until a year and three weeks later. They filed 41 days after they first appeared before the IJ. From your perspective, the time issue is not a problem. We should go right to the merits. Well, I believe the court should reverse the BIA with respect to the reasonable, whether it was reasonable to file. I understand. The answer to Judge Smith's question is yes. Correct. It is. And then the BIA have to issue a decision on the asylum application. Did they have the 10% chance of being persecuted? All right. Thank you. Thank you both very much. The case just argued will be submitted. The next case for argument is Lee v. Clinton, Hillary Clinton.
judges: Reinhardt, Kleinfeld, Smith